

DA 13-0457

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2014 MT 61

LARSON LUMBER COMPANY, INC.,

      Plaintiff and Appellee,

  v.

BILT RITE CONSTRUCTION AND LANDSCAPING
LLC; YAAK RIVER CONTRACTING, INC.;
ANITA BARTZ, and CASEY RANKIN,

      Defendants and Appellants.

APPEAL FROM:    District Court of the Nineteenth Judicial District,
                In and For the County of Lincoln, Cause No. DV-10-316
                Honorable James B. Wheelis, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

                David G. Tennant, Kaufman Vidal Hileman Ellingston PC,
                Kalispell, Montana

        For Appellee:

                James H. Cossitt, James H. Cossett, PC, Kalispell, Montana

                Amy N. Guth, Attorney at Law, Libby, Montana

                          Submitted on Briefs:  January 29, 2014
                                  Decided:  March 11, 2014

Filed:

                            _____
                                       Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Defendants appeal from the Findings of Fact, Conclusions of Law, and Order entered by the Nineteenth Judicial District Court, Lincoln County. Larson Lumber Company (Larson) filed two actions, subsequently consolidated, alleging breach of contract and fraud against Defendants. After a bench trial, the court entered judgment in Larson's favor, holding that Casey Rankin (Rankin) and Bilt Rite Construction and Landscaping, LLC (Bilt Rite) had breached a written contract with Larson, and that a transfer of real property from Bilt Rite to Anita Bartz (Bartz) was a fraudulent transfer. The court's order allowed Larson to execute its judgment for the contract debt on the real property and further awarded attorney fees to Larson based on a contractual provision.

¶2 We affirm in part and reverse in part. The parties raise the following issues:

¶3 *1. Is the appeal mooted by Larson's taking title to the real property?*

¶4 *2. Did the District Court err by denying summary judgment to Defendants?*

¶5 *3. Did the District Court err by holding that Rankin and Bilt Rite were jointly and severally liable to Larson?*

¶6 *4. Did the District Court err by holding that the Bartz loan was made to Rankin personally?*

¶7 *5. Did the District Court err by holding that Bilt Rite did not receive reasonably equivalent value in exchange for the Lot 6 property?*

¶8 *6. Did the District Court err by holding that the transfer of Lot 6 to Bartz was a fraudulent transfer?*

¶9 *7. Did the District Court err by awarding fees against Bartz?*

2

¶10 *8. Did the District Court err by holding that the claim limits under the Uniform Fraudulent Conveyance Act did not prohibit Larson from taking the entire property?*

¶11 *9. Did the District Court err by denying Bartz's claim for a homestead exemption?*

¶12 Resolution of Issues 8 and 9 is unnecessary to our holding, and we do not address them.

## FACTUAL AND PROCEDURAL BACKGROUND

¶13 Bilt Rite originally incorporated in 2003 as a member-managed LLC engaged in general contracting and brush removal. Rankin and his son-in-law Merrill Taylor (Taylor) were equal partners in Bilt Rite. Bilt Rite did not own equipment in its own right, but used equipment owned personally by Rankin and Taylor. This equipment was also used by Rankin and Taylor for other work unrelated to Bilt Rite. Bilt Rite started out doing small remodel jobs, but in 2006 contracted to build a home for Bill Reddig (Reddig job).

¶14 Larson Lumber operates a building material and supply store in Troy. Larson routinely allows approved customers to buy items on revolving credit accounts, with payments due monthly. Rankin opened an account with Larson in 2003, and an account was opened for Bilt Rite in 2005. Larson was the material supplier for the Reddig job. Throughout 2006, Bilt Rite increased the balance on its account with Larson but did not make the required monthly payments. Later, Bilt Rite made a couple of large payments on the overdue account, including a $27,000 payment on November 6, 2006. At the end of 2006, Bilt Rite still owed approximately $14,000.

¶15 Bartz works for Estuary Corporation as the ranch manager at Lake Okaga Ranch. Rankin also works at Lake Okaga, and Bartz has been his boss there since 2003. Both live at the Lake Okaga property. Though Larson alleged that Bartz and Rankin were romantically involved during the disputed events, no evidence to this effect was presented. Bartz and Rankin were in a romantic relationship at the time of trial but both denied that they were romantically involved in 2006.

¶16 On October 11, 2005, Bartz gave $45,000 to Rankin or Bilt Rite. The nature of this transaction is highly disputed and is discussed further below. The money was deposited into Bilt Rite's business account and the undisputed evidence shows that the money was used to purchase a skidder and welding truck, to pay Bilt Rite business expenses, and to purchase a vacant lot in a new subdivision. The vacant lot was Lot 6 of Airbase Flats III (Lot 6), which Bilt Rite purchased by paying approximately $12,000 in cash and assuming a contract for deed with approximately $33,000 outstanding.[1] Bilt Rite planned to build a "spec house" on the property. Soon after, Bartz began asking when her $45,000 would be repaid.

¶17 On December 1, 2006, Bilt Rite transferred the Lot 6 property to Bartz. She assumed the remaining balance on the contract for deed and subsequently paid it in full. Following Bartz's acquisition of Lot 6, she arranged to have a house built on the property. The extent of that construction project is unclear, but it is undisputed that, at the time Bartz acquired the property, the only improvements were some foundation work

---

[1] The contract for deed required payments of $303.83 per month with an interest rate of 7%.

and a well. Larson presented testimony from other Estuary employees that they were paid in cash by either Bartz or Rankin to construct the house on Lot 6 as side work. These witnesses testified to their understanding that it was Bartz and Rankin's house together, and that Rankin was generally in charge of the project, but they did not know where the money came from or that Rankin actually held an interest in the property.

¶18 Larson began to question Rankin and Bilt Rite about getting the Bilt Rite account settled in late 2006 or early 2007. Rankin assured Larson he intended to pay the debt, and asked Larson to write up a contract for payment of the debt for him to sign. On or about January 15, 2007, Rankin signed a document drafted by Larson entitled "Binding Agreement," which stated "Rankin does hereby agree to pay [Larson] the amount of $15,604.85" at a rate of 12% interest. Rankin promised to pay at least $500 monthly, and agreed to pay all attorney fees and court costs in the event of a breach of the agreement. Though the body of the agreement only references Rankin, Bilt Rite's name is printed with Rankin's name under the signature line. Rankin made a few payments by personal check, beginning with $500 payments and later $250 payments, before stopping payment altogether. Larson subsequently learned that Bilt Rite had ceased operations in late 2006.

¶19 Rankin testified that in 2006, Bilt Rite was bringing in business quickly that they "were not really prepared to take on." Rankin estimated the business owed over $100,000 in debt, and testified he had paid significant business expenses out of his own pocket. In late 2006, the State of Montana ordered Bilt Rite to stop operating until it was current on its worker's compensation contributions. Rankin estimated that Bilt Rite owed

between $70,000-$80,000 in payroll taxes and worker's compensation contributions. Because the business couldn't bring that current, Rankin testified that he decided to shut down the business. Taylor left Montana at some point in late 2006. In early February 2007, Rankin notified the Secretary of State's office that he was no longer associated with Bilt Rite, and that office involuntarily dissolved the business.

¶20 On January 26, 2007, Rankin registered Yaak River Contracting as a sole proprietorship. On June 24, 2009, Yaak River Contracting, Inc. was incorporated with Rankin as president, holding 49% interest, and Bartz as vice-president, secretary, and treasurer, holding 51%. Both entities appear to have been formed to provide general contracting services. As of trial, Yaak River Contracting, Inc. did not have any assets in its name and used equipment and machinery owned by Bartz or Rankin.

¶21 In September 2009, Larson filed a complaint against Rankin, Taylor, and Bilt Rite alleging that each was jointly and severally liable for the debt evidenced by the Binding Agreement. Rankin and Bilt Rite filed an answer in which they claimed that Larson fraudulently induced Rankin to sign the Binding Agreement with false representations that the agreement would bind only Bilt Rite. Rankin and Bilt Rite raised several other affirmative defenses to Larson's claim that Rankin was personally liable. Shortly after the complaint was filed, Taylor and Rankin both filed personal bankruptcy and were dismissed from the suit without prejudice.

¶22 In November 2010, Larson filed a separate lawsuit against Bilt Rite, Yaak River Contracting, Inc., and Bartz claiming fraud, constructive fraud, fraudulent transfer,

6

conspiracy, aiding and abetting, successor liability, and punitive damages. Larson alleged that Rankin and Bilt Rite conspired with Bartz and Yaak River to hide assets from Larson to avoid paying the debt it was owed. Specifically, Larson claimed that the transfer of the Lot 6 property from Bilt Rite to Bartz was a fraudulent transfer. Yaak River and Bartz moved the court to dismiss the complaint for failure to join Rankin as an indispensable party. Rankin filed an affidavit in support of this motion confessing that he was an indispensable party. However, when Larson thereafter filed a motion to lift the stay in Rankin's bankruptcy case, Rankin opposed this motion, arguing that the state court could fashion an appropriate remedy without Rankin's involvement. The Bankruptcy Court granted Larson's motion to lift the stay, reasoning that Rankin was estopped from taking different positions in the different courts. Rankin was subsequently joined as a party in the fraud case, and the two lawsuits (fraud and breach of contract) were consolidated.

¶23 Defendants twice moved for summary judgment on all claims. After the second motion, Larson conceded to entry of summary judgment on its conspiracy, aiding and abetting, successor liability, and punitive damages claims. The District Court denied Defendants' motion with regard to the other claims. On February 12, 2013, the matter was tried to the court without a jury. At trial, Larson voluntarily dismissed its claims that Bartz's ownership of Yaak River stock was a fraudulent transfer and that Bilt Rite had fraudulently transferred other "hard and soft assets" to Bartz "along with a 51% stock ownership in Yaak [River], Inc." The District Court and the parties agreed that the only

7

issues left to determine at trial were the validity of the debt under the Binding Agreement and whether the Lot 6 property had been fraudulently transferred to Bartz.

¶24 Following trial, the court entered judgment in favor of Larson. It held that Rankin and Bilt Rite were jointly and severally liable for the debt evidenced by the Binding Agreement, and had both breached the contract by their failure to make required payments. The court determined that Rankin and Bilt Rite owed Larson $26,944.25, plus accruing interest, and awarded attorney fees against them pursuant to the agreement. The court also set aside the transfer of Lot 6 to Bartz as a fraudulent transfer, denying her claim of a homestead exemption. The court further concluded that Larson could recover its attorney fees against Bartz because "[w]hen [she] received the benefit of the fraudulent transfer, Bartz assumed the risk of exposure to Larson's efforts to collect its debts." Finally, the District Court denied Bartz's argument that, under the Uniform Fraudulent Conveyance Act, Larson was only entitled to collect the lesser of the value of the property when received or the amount of its claim. Instead, the court allowed Larson to execute its judgment on the entire property without regard to the change in the property's value following Bartz's payoff of the contract for deed and her new home construction. Defendants appeal.

**STANDARD OF REVIEW**

¶25 A district court's denial of summary judgment is reviewed de novo applying the same M. R. Civ. P. 56 criteria as the district court. *Polzin v. Appleway Equip. Leasing, Inc.*, 2008 MT 300, ¶ 9, 345 Mont. 508, 191 P.3d 476. Summary judgment is only

appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Polzin*, ¶ 9. All reasonable inferences which may be drawn from the evidence must be drawn in favor of the party opposing the motion. *Corporate Air v. Edwards Jet Ctr. Mont., Inc.*, 2008 MT 283, ¶ 24, 345 Mont. 336, 190 P.3d 1111. "Summary judgment is an extreme remedy that should never be a substitute for a trial on the merits if a controversy exists over a material fact." *Corporate Air*, ¶ 24.

¶26 We will affirm the findings of fact of a trial court sitting without a jury unless the findings are clearly erroneous. *Jones v. Arnold*, 272 Mont. 317, 322, 900 P.2d 917, 921 (1995). Findings of fact are clearly erroneous if they are not supported by substantial evidence, if the trial court misapprehended the effect of the evidence, or if this Court is left with a definite and firm conviction that a mistake has been made. *Jones*, 272 Mont. at 323, 900 P.2d at 921. Substantial evidence exists when the record contains "relevant evidence which a reasonable mind might accept as adequate to support a conclusion." *Montanans v. State*, 2006 MT 277, ¶ 79, 334 Mont. 237, 146 P.3d 759 (citation omitted). We review a district court's conclusions of law to determine whether the court's interpretation of the law is correct. *Youderian Constr. v. Hall*, 285 Mont. 1, 6, 945 P.2d 909, 912 (1997).

## DISCUSSION

¶27 *1. Is the appeal mooted by Larson's taking title to the real property?*

¶28 Larson argues the appeal in this case is moot because, following the District Court's judgment, Defendants failed to request a stay of execution and Larson executed

9

upon the judgment by a sheriff's sale of Lot 6, at which it was the successful bidder. Larson argues that because title to the property has already transferred, this Court cannot restore the parties to their original positions, and an order of restitution will not restore title to the property in Bartz.

¶29 "Mootness is a threshold issue which must be considered before addressing the underlying dispute." *Povsha v. City of Billings*, 2007 MT 353, ¶ 19, 340 Mont. 346, 174 P.3d 515. A dispute is moot when it once existed but "because of an event or happening, it has ceased to exist and no longer presents an actual controversy." *Povsha*, ¶ 19 (citation omitted). Whether or not effective relief can be granted under the circumstances depends on the "unique facts, procedural posture, and relief requested in the particular case." *Progressive Direct Ins. Co. v. Stuivenga*, 2012 MT 75, ¶ 49, 364 Mont. 390, 276 P.3d 867. If restitution or some other form of relief is possible upon reversal "then the appeal is not moot-even if property has changed hands and third-party interests are involved." *Progressive Direct*, ¶ 49.

¶30 Larson has not articulated why an order of restitution could not provide effective relief in this case despite the property changing hands or why the property cannot be restored in Bartz simply because Larson purchased it at sheriff's sale. Larson's ownership of the property is subject to a right of redemption pursuant to § 25-13-801 *et seq.*, MCA, allowing Bartz the option of purchasing the property back for a specified amount until August 7, 2014. Bartz also filed a Notice of *Lis Pendens* with the Clerk and Recorder's office to provide notice to potential purchasers of her claim to the property

10

based on this appeal. Thus, at a minimum, a court could award her restitution in an amount that would allow her to redeem the property. Because effective relief is still possible, the appeal is not moot.

¶31   *2. Did the District Court err by denying summary judgment to Defendants?*

¶32   Defendants argue the District Court erred in failing to fully grant its second motion for summary judgment because there were no material issues of disputed fact and it was entitled to judgment as a matter of law.[2]   Entry of summary judgment may be proper when

> the parties are not arguing over what happened or presenting conflicting evidence; they merely need to know which of them, under the uncontested facts, is entitled to prevail under the applicable law. In such a case, the district court judge need not weigh evidence, choose one disputed fact over another, or assess credibility of the witnesses.

*Cole v. Valley Ice Garden, LLC*, 2005 MT 115, ¶ 4, 327 Mont. 99, 113 P.3d 275. Conversely, if the district court judge is required to weigh evidence, choose between disputed facts, or assess the credibility of witnesses, an entry of summary judgment is inappropriate.

---

[2] Within their arguments, Defendants, by their counsel, make repeated accusations of improper conduct and essential bias on the part of the District Court, claiming that the court engaged in a "vendetta against Rankin," "decided early on in this matter based on Larson's fabricated allegations and then did everything in its power to support its preconceived result," and "turned a blind eye to dispositive facts." Defendants' briefing criticizes the District Court for other asserted errors that are not raised as issues on appeal, such as denying Defendant a jury trial and "overrul[ing] Defendants" when there was no objection. These statements in appellate briefing are inappropriate. If a party has a concern about judicial bias, the law provides a process to address that concern and it should not serve as briefing fodder. Defendants did not seek to have the district judge disqualified for bias, and we reprove the Defendants' disparagement of the judiciary before this Court.

11

¶33 Whether a transfer by a debtor is a fraudulent transfer is a fact intensive determination. Among other factors, a court must consider whether a transfer was to an "insider," the debtor retained possession or control over the property following the transfer, the debtor was insolvent at the time of or immediately following the transfer, and whether the transfer was in exchange for reasonably equivalent value. *See* § 31-2-333, MCA. The record shows that there were significantly disputed factual questions regarding these factors, as we discuss below. For example, Larson's primary contention was that the $45,000 transferred from Bartz was a personal loan to Rankin, rather than a loan to Bilt Rite, as Defendants claimed. Larson's contention, if true, could result in the real property transfer from Bilt Rite to Bartz being an exchange without value. Additionally, Larson sought to prove that Rankin retained control over the real property following the transfer and that Bilt Rite was then insolvent. These factual disputes, along with their accompanying credibility determinations, prevented an entry of summary judgment. The District Court did not err in denying Defendants' motion.

¶34 *3. Did the District Court err by holding that Rankin and Bilt Rite were jointly and severally liable to Larson?*

¶35 Rankin and Bilt Rite argue that the District Court erred in holding that Rankin signed the Binding Agreement in both his individual capacity and as an agent for Bilt Rite. They assert that "[t]he language of the agreement unequivocally states that only Rankin is personally liable on the note. The agreement contains no language that Bilt Rite or any other person or entity besides Rankin promised to pay Larson." Rankin and Bilt Rite's argument on this issue is that the plain terms of the agreement confer liability

12

for the debt only upon Rankin. At trial, Rankin testified that Larson prepared the document and included the name Bilt Rite under his signature line. Rankin also testified that he made the agreement with Larson and had agreed to pay the debt personally, rather than on behalf of Bilt Rite.

¶36 However, in the breach of contract suit, which was consolidated with the fraud suit to form this action, the greater part of Rankin and Bilt Rite's Answer contested the personal liability of Rankin in any respect, and even alleged that to the extent the agreement was binding on Rankin personally, it was signed as a result of fraud by Larson. Specifically, Rankin and Bilt Rite, represented by the same attorney at all times, pled: "The agreement alleged by [Larson] is unenforceable to impose personal liability on [Rankin] pursuant to Section 28-2-903, MCA"; "[Rankin] rescinded any alleged agreement once he discovered it was [Larson's] intent to impose personal liability on him"; "Larson also represented to [Rankin] and Bilt Rite that the amount payable under the agreement would only be paid by Bilt Rite and Bilt Rite would be liable for such amounts"; "Larson intended that [Rankin] and Bilt Rite would rely on its representations to them that . . . there would be no personal liability by [Rankin] for any amount owed"; "Larson gained an advantage by misleading [Rankin] to his prejudice that he would not be personally liable for amounts due under the agreement"; and, lastly, "[Rankin] did not sign any agreement to be liable to [Larson] individually."

13

¶37    At a minimum, Rankin and Bilt Rite's completely inconsistent arguments about the contract language demonstrate that the language of the contract was not clear and unambiguous.    Further, judicial estoppel prevents them from taking such contrary positions.  *See Fiedler v. Fiedler*, 266 Mont. 133, 140, 879 P.2d 675, 679-80 (1994) (elements of judicial estoppel are (1) estopped party must have knowledge of the facts at the time the original position is taken, (2) party must have succeeded in maintaining the original position, (3) position presently taken must be actually inconsistent with the original position, and (4) original position must have misled the adverse party so that allowing the estopped party to change its position would injuriously affect adverse party). In the breach of contract case, filed before his bankruptcy petition, Rankin asserted that only Bilt Rite was bound by the agreement, and on that basis he obtained a dismissal from that proceeding.  Thereafter, Larson initiated an action against Bilt Rite and Bartz for fraud based on Rankin's admission that Bilt Rite had agreed to pay this debt despite his knowledge that the business was no longer in existence.  In light of this record, we conclude that the District Court did not err in finding joint and several liability between Rankin and Bilt Rite for the debt to Larson.

¶38    *4. Did the District Court err in holding that the Bartz loan was made to Rankin personally?*

¶39    Larson attempted to prove a fraudulent conveyance of Lot 6 to Bartz by claiming that Bartz lent the money to Rankin personally, resulting in the transfer of real property to Bartz from Bilt Rite being without an exchange of value and consideration. Alternatively, Larson sought to prove that Bartz invested the money in Bilt Rite as a

14

member of the entity, making her an "insider" who then received assets of the insolvent business. Thus, Larson sometimes argues that the funds were a loan to Rankin and at other times argues they were an investment in Bilt Rite. In its findings of fact, the District Court determined the money was indeed a personal loan to Rankin. Because the loan was made to Rankin individually, the court further determined that Bilt Rite did not receive reasonably equivalent value in exchange for the transfer of Lot 6 to Bartz. In its conclusions of law, the court held the transfer was constructively fraudulent under § 31-2-333(1)(b), MCA, because Bilt Rite did not receive reasonably equivalent value for the land at a time it was insolvent. However, the court also concluded that Bartz was an insider of the corporation who received Lot 6 as part of an intentional scheme to defraud creditors, pursuant to § 31-2-333(1)(a), MCA. The court entered no findings of fact establishing Bartz was an "insider," as defined in § 31-2-328(7), MCA. In this issue we consider the status of the $45,000 transferred by Bartz.

¶40     Starting with evidence that is essentially undisputed, the $45,000 from Bartz was deposited in Bilt Rite's business account. Those proceeds were used for business purposes—purchase of a skidder and welding truck, payment of Bilt Rite's bills, and purchase of vacant Lot 6 for a location to build a spec house. Lot 6 was purchased by Bilt Rite two weeks after the $45,000 transfer was made and was titled in Bilt Rite's name. Larson did not present any evidence to contradict Bilt Rite's use of the $45,000 for these purposes. Later, Bartz began asking when her $45,000 would be repaid. Bilt Rite then transferred Lot 6 to Bartz, which required her to assume the liability under the

15

contract for deed on the property. Bartz made payments on this contract until the debt, approximately $33,000, was retired. She then arranged for a house to be constructed on the property. In her deposition, attached as an exhibit to Larson's Cross Motion for Summary Judgment and admitted into the record at trial by Larson, Bartz testified that she transferred $30,000 by wire transfer to Bilt Rite's account, and $15,000 by check made out to Bilt Rite. A copy of the check made out to Bilt Rite was entered into evidence at trial, and Bartz identified a document shown to her by Larson's counsel during the deposition as a wire transfer from her USAA bank account to Bilt Rite Construction.

¶41 Larson asserts that "Bartz, in her deposition, characterized her contribution to Bilt Rite as an investment, not a loan," but overstates the record. Bartz's testimony is murky at best on the technical nature of the money she transferred to Bilt Rite. Bartz testified that money transferred to Bilt Rite was for "the loan aspect or the investment in Bilt Rite Construction." She indicated that the money was given to Bilt Rite as "a loan or, slash, investment" from which she hoped to get a return. Considered in its entirety, Bartz's testimony during her deposition does little to support Larson's claims that she admitted the money was not a loan. It is notable that Larson pled that members Rankin and Taylor "each had a 50% ownership interest in Bilt Rite," thus contradicting its claim that Bartz invested in the business for an equity position rather than making a traditional loan to the business.

¶42 Larson presented witnesses who testified about the debt owed to Larson by Bilt Rite, evidenced by the Binding Agreement signed by Rankin, and the work done on Lot 6 after the property was transferred to Bartz. Larson did not present specific evidence about the transaction between Bartz and Bilt Rite and/or Rankin, but rather offered what it characterized as inconsistencies between Rankin's prior testimony in other proceedings and Rankin's and Bartz's testimony in the present proceeding.

¶43 Though the District Court found that Rankin was not a credible witness and chose to disregard his testimony, Larson relied heavily upon Rankin's testimony to make its case, both in the District Court and before this Court. Larson contends that "Rankin testified at his bankruptcy proceeding that Bartz lent money to Rankin, individually." Rankin did testify in the bankruptcy proceeding that "she made the loan to me," but stated it was for "business type things." He further offered a clarification that "[w]e borrowed $45,000.00; we being Bilt Rite Construction." Considered as a whole, Rankin's answers are ambiguous at best, and cannot be taken as a clear admission that the money was a personal loan. Importantly, the undisputed evidence about Bilt Rite's receipt and actual use of the money contradicts Larson's individual loan theory.

¶44 The District Court did not find that the $45,000 transfer was an equity investment in Bilt Rite, but rather a personal loan to Rankin. There is no explanation in the findings of fact or conclusions of law for evidence on which the court made this determination. The court simply made the general findings that "Rankin borrowed $45,000.00 from Bartz in 2005 or 2006," and "[t]he Lot 6 transfer to Bartz was executed to forgive debt

17

owed by Rankin individually." The material evidence all supports a conclusion that the money was transferred directly to Bilt Rite and used by Bilt Rite for entirely business purposes. Bartz asked for repayment and was paid by property titled in Bilt Rite's name. Although Larson can point to isolated statements from Rankin and Bartz referring to the money as a loan to Rankin, the totality of their testimony, as noted above, does not consistently bear that out. Thus, we conclude that no substantial evidence exists in the record to support the District Court's conclusion that the $45,000 was a personal loan to Rankin. Rather, it was a loan made to Bilt Rite.

¶45    *5. Did the District Court err by holding that Bilt Rite did not receive reasonably equivalent value in exchange for the Lot 6 property?*

¶46    Having concluded that the $45,000 from Bartz was a loan made to Bilt Rite directly, we next examine whether Bilt Rite's transfer of Lot 6 and the associated debt to Bartz in exchange for cancellation of the debt was a transfer of reasonably equivalent value at the time. The evidence indicated that Bilt Rite paid approximately $12,000 in cash and assumed a debt of approximately $33,000 to purchase Lot 6. Bilt Rite owned the property between October 27, 2005, and December 1, 2006, and made the required monthly payments of $303.83 during this brief period before transferring Lot 6 to Bartz, who assumed the remaining debt under the contract for deed. From Bilt Rite's perspective, it satisfied a $45,000 debt owed to Bartz with property it had obtained for a purchase price of approximately $45,000, albeit with an indebtedness of about $33,000. Bartz assumed that debt, making the deal even more advantageous for Bilt Rite. Thus, Bilt Rite clearly received reasonably equivalent value from the transfer—actually, a very

18

high value. Although the deal was not as good on paper for Bartz, there is indication in the record that the value of Lot 6 was appreciable and that it was a site well suited for house construction, which attracted Bilt Rite to the property originally. Any appreciable value accrued to Bartz to help offset her assumption of the $33,000 debt. We conclude the transaction was one for reasonably equivalent value.

¶47    *6. Did the District Court err by holding that the transfer of Lot 6 to Bartz was a fraudulent transfer?*

¶48    The Uniform Fraudulent Transfer Act provides that a transfer can be found to be either intentionally or constructively fraudulent. The District Court concluded that the Lot 6 transfer to Bartz satisfied the requirements for both types of fraudulent transfers.

¶49    An intentionally fraudulent transfer occurs when a debtor makes the transfer with actual intent to hinder, delay, or defraud a creditor of the debtor. Section 31-2-333(1)(a), MCA. To determine "actual intent," a court may consider several factors, including whether the transfer was made to an "insider," the debtor retained possession or control over the property after the transfer, the transfer was concealed or disclosed, the debtor had been sued or threatened with a lawsuit shortly before the transfer, the transfer was substantially all of the debtor's assets, the debtor did not receive reasonably equivalent value to the value of the asset transferred, and the debtor was insolvent at the time of, or immediately after, the transfer. Section 31-2-333(2), MCA. An "insider" is defined as a director or officer of the debtor; a person in control of the debtor; a partnership in which the debtor is a general partner; or a relative of a general partner, director, officer or person in control of the debtor. Section 31-2-328(7)(b), MCA. In turn, "relative" is

19

defined as "an individual related by consanguinity within the third degree as determined by the common law; [ ] a spouse or an individual related to a spouse within the third degree as so determined; or [ ] an individual in an adoptive relationship within the third degree." Section 31-2-328(11), MCA.

¶50    A constructively fraudulent transfer can be found, even without proof of "actual intent," if the transfer was made "without receiving a reasonably equivalent value in exchange for the transfer" *and* the debtor was either engaged or was about to engage in a transaction for which the remaining assets of the debtor were unreasonably small in relation to the transaction, or "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." Section 31-2-333(1)(b), MCA.

¶51    Applying the Uniform Fraudulent Transfer Act to the record here, we conclude the District Court erred in holding that a fraudulent property transfer occurred under either theory. A finding of constructive fraud is precluded by our previous determinations. The statute first and foremost requires a transfer be made without reasonably equivalent value. Here we have concluded the transfer was made with reasonably equivalent value. Having done so, we need not consider the further requirements under the statute.

¶52    With regard to an intentionally fraudulent transfer, evidence was presented that the transfer represented a substantial part of Bilt Rite's assets, and that it was insolvent at the time of the transfer. However, there was no evidence that Bartz was an insider, that the transfer was concealed, or that the transfer was made before or shortly after a substantial

20

debt was incurred. Bilt Rite's debts, such as payroll taxes, were of long standing. Although Rankin signed the Binding Agreement a little more than a month after the transfer, the debt was actually incurred by Bilt Rite over the course of 2006—prior to the transfer—and Bilt Rite had substantially reduced its debt to Larson less than a month before the transfer with the $27,000 payment on November 6, 2006. Bartz was not an equity-holder of Bilt Rite and, even if Larson's unsupported allegations of a romantic relationship with Rankin were true, such a relationship does not meet the definition of "relative" under the statute. Most importantly, as we have already concluded, this transfer was for reasonably equivalent value. Though Bilt Rite was insolvent before the transfer, it significantly reduced its debt by way of this transfer. Had the transfer not occurred, Bartz would have had a claim against Bilt Rite for $45,000 and Bilt Rite would still have owed the $33,000 on the Lot 6 property. The transfer of Lot 6 to Bartz eliminated both debts of the business. While the transfer may well have been a strategic move to insure that Bartz was repaid, such a show of favoritism between legitimate, unprioritized creditors does not, by itself, constitute a fraudulent transfer. On this record, we cannot conclude that the statutory factors support a determination that the transfer was made with actual intent to defraud the creditors of Bilt Rite.

¶53   *7. Did the District Court err by awarding fees against Bartz?*

¶54   Having concluded that the transfer to Bartz was not fraudulent, there remains no support for an award of fees against Bartz, who was not party to the Binding Agreement or otherwise liable for Bilt Rite's debts. We reverse the award of fees against her.

21

¶55    Affirmed in part, reversed in part, and remanded for further action consistent with this opinion.

/S/ JIM RICE


We concur:

/S/ MIKE McGRATH
/S/ BETH BAKER
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER